BRIAN M. BOYNTON, Acting Assistant Attorney General, Civil Division
MICHAEL D. GRANSTON, Deputy Assistant Attorney General
GUSTAV W. EYLER, Director, Consumer Protection Branch
LISA K. HSIAO, Assistant Director
ALISHA M. CROVETTO, Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
450 5th Street, N.W.
Washington, DC 20530
Telephone: (202) 305-7196
alisha.m.crovetto@usdoj.gov

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>VIVINT SMART HOME, INC., a corporation,<br><br>Defendant. | Case No. 2:21-cv-00267-TS<br><br>**COMPLAINT FOR CIVIL PENALTIES, PERMANENT INJUNCTION AND OTHER RELIEF**<br><br>**Judge Ted Stewart** |

Plaintiff, the United States of America, acting upon notification and authorization to the Attorney General by the Federal Trade Commission ("FTC" or "Commission"), for its Complaint, alleges:

1.  Plaintiff brings this action under Sections 5(a), 13(b), and 16(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 53(b), and 56(a), and Section 621(a) of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s(a), to obtain monetary civil penalties and permanent injunctive or other relief for Defendant's violations of the FTC Act, 15 U.S.C. § 45(a); the FCRA, 15 U.S.C. §§ 1681-1681x; and the Duties Regarding the Detection,

Prevention, and Mitigation of Identity Theft ("Red Flags Rule"), 16 C.F.R. § 681.1, issued pursuant to Section 615(e) of the FCRA, 15 U.S.C. § 1681m(e).

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355, and 15 U.S.C. § 1681s(a).

3. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), 1395(a), and 15 U.S.C. § 53(b).

## DEFENDANT

4. Defendant Vivint Smart Home, Inc. ("Vivint" or the "Company"), is a Delaware corporation with its principal place of business at 4931 North 300 West, Provo, Utah 84604. Vivint transacts business in this District.

## COMMERCE

5. At all times relevant to this Complaint, the Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANT'S BUSINESS ACTIVITIES

6. Vivint sells smart home technology platforms, including home security devices and related monitoring services. The Company currently serves over 1.5 million customers in the United States and Canada. One of the channels through which Vivint acquires new customers is its door-to-door sales force, which includes young adults, often students on summer breaks. Vivint equips its sales representatives with iPads loaded with Vivint's proprietary sales

system—Street Genie—which manages the new customer onboarding process, including customer credit verifications with Consumer Report Agencies ("CRAs").

**New Account Credit Financing**

7. The typical Vivint smart home security and monitoring system costs approximately one thousand dollars or more, and thus most consumers finance the cost of the equipment with a loan.

8. Prior to 2017, Vivint offered its customers a package that included home security and automation equipment and monitoring services for a combined monthly fee. Under this product offering, customers were required to pass a credit check and agree to subscribe to Vivint's services for a minimum contractual term, which usually ranged from 36 to 60 months.

9. Since 2017, Vivint has offered its customers the option of financing home security equipment with Vivint internally through its own loans, called Retail Installment Contracts ("RICs"). These internally-financed credit arrangements have made up a substantial portion of Vivint's sales from 2017 through 2019.

10. In the second quarter of 2017, Vivint began offering an additional financing option to its customers, called "Vivint Flex Pay," which connects the customer with a third-party bank for financing. If a customer declines or does not qualify for the third-party financing but meets Vivint's minimum criteria, Vivint continues to offer its internal financing option through RICs.

11. RIC accounts made up approximately 32% of new accounts sold in 2017, approximately 20% of accounts sold in 2018, approximately 11% of new accounts sold in 2019,

and approximately 3% of accounts sold through the fall of 2020, in total amounting to hundreds of thousands of customer accounts over this time period.

12. For either type of approach to credit financing, Vivint requires that potential customers satisfy a certain threshold of creditworthiness in order to qualify for the loan. In connection with a RIC, the determination of creditworthiness is made through an inquiry to a CRA by the door-to-door Vivint sales representative through Vivint's custom software.

### Misconduct by Sales Representatives

13. Vivint compensates its seasonal sales representatives entirely through commissions for the sales of new systems. These sales representatives are attracted to Vivint by the promise of a lucrative summer job. As with any commission-based occupation, this approach to payment incentivized the sales representatives to work hard and, occasionally, to cut corners. In Vivint's case, the compensation structure combined with the lack of effective oversight also incentivized the representatives to violate the law.

14. As part of the customer onboarding process, the Vivint sales representative must request and obtain from a CRA a consumer report to evaluate the potential customer's creditworthiness. The sales representative uses Vivint's Street Genie app on the Company-issued iPad to request and obtain the consumer's credit report from a CRA. Due to the size of the Vivint business and the size of its seasonal sales force—more than 4,000 in an average year—Vivint's sales representatives request thousands of consumer credit reports per day during its peak sales season from April through October each year, and continue to request numerous credit reports per day the rest of the year. For example, Vivint's sales representatives made more than 130,000 inquiries to a single CRA in a single month in 2016.

15. If a customer meets the credit requirement, the sales representative is able to complete the new customer registration and earn the commission. If a customer does not qualify, then the sales representative cannot proceed with the new customer registration. As a result, certain Vivint sales representatives developed two means by which to deceive the software to permit them to register a new customer who did not satisfy the credit requirement—the first is informally known as "white paging" and the second is adding impermissible co-signers.

16. Although the specifics could vary, "white paging" worked generally as follows: If a potential customer did not satisfy the credit requirement, the sales representative would use the white pages to identify an unrelated individual with a same or similar name to the customer who had just failed the credit check. The sales representative would then enter that unrelated customer's address as a "previous address" in the Street Genie app, and re-run the credit check, pulling the credit score of the similarly-named third party. The sales representative would thereby trick Vivint's system into approving a new account for the unqualified customer by unlawfully using the credit history of the unrelated individual. Vivint would then extend credit to this unqualified customer, based on the third party's credit score.

17. Adding impermissible co-signers worked similarly, except the name unlawfully added to the account was not the same or similar to the primary account holder. For example, a Vivint sales representative might ask a consumer who had failed credit whether they knew of anyone else who might qualify (*e.g.*, a relative). The rep would then obtain a credit report for that individual without permission, add their address into "previous address" and thereby qualify the primary account holder. In other instances, the representative would add a co-signer on the account whom the primary account holder does not know, but is a person the representative

knows can pass credit. Similarly to white paging, Vivint would then extend credit to the unqualified customer, based on the innocent third party's credit score.

18. In the event that a customer registered under such false pretenses eventually defaulted on its Vivint account, the address of the unrelated individual with the same or similar name or the impermissible co-signer entered into Street Genie as a "previous address" would be passed on to Vivint's debt buyer, thus implicating the innocent individual's credit standing and causing them to be pursued by debt collectors. Consumers have complained to the FTC and the Better Business Bureau accusing Vivint of identity theft, with several consumers describing this exact scenario—the consumer learns from a collection agency that they have defaulted on a Vivint account, but they had never even heard of Vivint, much less held an account with the company.

### Vivint Knew About Sales Representatives' Misconduct And Allowed It To Continue

19. Vivint has been aware of "white paging" since at least 2016, but failed to take meaningful steps to curb the problem.

20. In early 2017, Vivint terminated hundreds of sales representatives for misconduct related to white paging and impermissible co-signers. Vivint later rehired some of these same sales representatives. Because one of the implicated sales teams generated millions of dollars of revenue for Vivint, the Company allowed many of the terminated sales representatives to work at Vivint's sister company for a year, and permitted some of them to return to Vivint the following sales season. Following the discovery of the scheme in 2016, Vivint instituted easily-circumvented controls to regulate the frequency with which the consumer reports were

requested. For example, the Company claims that its system limited running credit inquires to only two consumers per address. Sales representatives learned they could run multiple credit inquiries on a single address simply by modifying the sale location address slightly (*e.g.*, adding "BLDG 1" or "Apartment A" after the street address). This function would allow a sales representative to continue running credit inquires on an individual until the consumer "passes" credit and the representative can earn a commission on the sale.

21. Since at least 2017, several Vivint employees have warned Vivint managers that sales representatives have continued to evade the meager prevention measures the Company attempted to implement. At least one company employee engaged in a back-end analysis that revealed issues with white-paging and impermissible co-signers. Evidence shows that the Company was aware of this scheme, and sometimes mildly penalized the worst offending sales representatives who had been involved. However, the Company allowed the practices to continue.

22. Notwithstanding the risk to which these practices expose the thousands of consumers whose consumer reports have been obtained from CRAs on a daily basis for years, Vivint did not have a written Identity Theft Prevention Program ("Program") designed to detect, prevent, and mitigate identity theft until January 2020, several months after the FTC began investigating Vivint and learning of the FTC staff's concerns.

23. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendant is violating or are about to violate laws enforced by the Commission.

## RED FLAGS RULE VIOLATIONS

24. Section 615 of the FCRA (15 U.S.C. § 1681m(e)) requires the FTC to promulgate rules requiring creditors to address identity theft. The Commission subsequently promulgated the Red Flags Rule (16 C.F.R. § 681.1), requiring that creditors offering covered accounts must address identity theft through, among other things, the:

> (d) Establishment of an Identity Theft Prevention Program –
>
> (1) Program requirement. Each financial institution or creditor that offers or maintains one or more covered accounts must develop and implement a written Identity Theft Prevention Program (Program) that is designed to detect, prevent, and mitigate identity theft in connection with the opening of a covered account or any existing covered account. The Program must be appropriate to the size and complexity of the financial institution or creditor and the nature and scope of its activities.
>
> (2) Elements of the Program. The Program must include reasonable policies and procedures to:
>
>> (i) Identify relevant Red Flags for the covered accounts that the financial institution or creditor offers or maintains, and incorporate those Red Flags into its Program;
>>
>> (ii) Detect Red Flags that have been incorporated into the Program of the financial institution or creditor;
>>
>> (iii) Respond appropriately to any Red Flags that are detected pursuant to paragraph (d)(2)(ii) of this section to prevent and mitigate identity theft; and
>>
>> (iv) Ensure the Program (including the Red Flags determined to be relevant) is updated periodically, to reflect changes in risks to customers and to the safety and soundness of the financial institution or creditor from identity theft.

16 C.F.R. § 681.1(d). In addition to these requirements, the Red Flags Rule imposes other requirements regarding the administration (16 C.F.R. § 681.1(e)) and content (16 C.F.R. § 681.1(f)) of the Identity Theft Prevention Program.

25. "Creditor" is defined in the Red Flags Rule initially by reference to Section 702 of the Equal Credit Opportunity Act ("ECOA") (15 U.S.C. § 1691a(d)). The ECOA defines "creditor" in pertinent part as "any person who regularly extends, renews, or continues credit; [or] any person who regularly arranges for the extension, renewal, or continuation of credit[.]" 15 U.S.C. § 1691a(e). Vivint is a "creditor" under the ECOA because it regularly extends, renews, continues, or arranges for the extension of credit through both the RIC accounts and the Vivint Flex Pay accounts.

26. The Red Flags Rule then narrows the ECOA definition of "creditor" by specifying in pertinent part that it only applies to creditors that, regularly and in the ordinary course of business "obtain[] or use[] consumer reports, directly or indirectly, in connection with a credit transaction[.]" 15 U.S.C. § 1681m(e)(4). Vivint is a "creditor" under the Red Flags Rule because it regularly extends, obtains or uses consumer reports in connection with its RIC and Vivint Flex Pay credit transactions.

27. The Red Flags Rule applies to "covered accounts," which it defines as an account that (1) "a creditor offers or maintains, primarily for personal, family, or household purposes, that involves or is designed to permit multiple payments or transactions, such as a credit card account, mortgage loan, automobile loan . . .cell phone account," and (2) "any other account that [a creditor] offers or maintains for which there is a reasonably foreseeable risk to customers or to the safety and soundness of the [creditor] from identity theft, including financial, operational, compliance, reputational, or litigation risks." 16 C.F.R. § 681.1(b)(3). Vivint's RIC accounts are "covered accounts" under the Red Flags Rule because they are accounts that Vivint, as a direct creditor, offers or maintains primarily for personal, family or household purposes (*i.e.*,

smart home monitoring system operations), and that involve multiple payments.  The RIC accounts involve a reasonably foreseeable risk to customers or Vivint from identity theft.

28.     Vivint failed to develop and implement a written Identity Theft Prevention Program designed to detect, prevent, and mitigate identity theft in connection with the opening of a covered account or any existing covered account.  Vivint's limited efforts to address identity theft were inadequate and, in any case, failed to satisfy the Red Flags Rule.  Vivint did not provide for adequate training or monitoring of employees who obtain consumer reports and participate in extending financing agreements to customers, and did not take into account previous allegations of identity theft at the Company.  In addition to being a clear violation of the language of the Red Flags Rule, Vivint's lack of an Identity Theft Prevention Program enabled systemic violations of the FCRA to the detriment of consumers, which would have been remediated had Vivint executed on the basic requirements of a Red Flags program, such as by examining the "methods it provides to open its covered accounts," 16 C.F.R. Appendix A(II)(A)(2) to Part 681, as discussed in the next Section.

29.     Section 621(a)(2)(A) of the FCRA, 15 U.S.C. § 1681s(a)(2)(A), as adjusted by 16 C.F.R. § 1.98(m), authorizes the Court to award monetary civil penalties of not more than $4,111 for each knowing violation of the FCRA that constitutes a pattern or practice of violations of the statute.

30.     Each instance in which Vivint has failed to comply with the Red Flags Rule's establishment of an identity theft prevention program provision, 16 C.F.R. § 681.1(d), constitutes a separate violation of the FCRA for the purpose of assessing monetary civil penalties.

## VIOLATIONS OF THE FCRA'S PERMISSIBLE PURPOSE REQUIREMENT

31. Section 621 of the FCRA, 15 U.S.C. § 1681s, authorizes the Commission to use all of its functions and powers under the FTC Act to enforce compliance with the FCRA by all persons subject thereto except to the extent that enforcement specifically is committed to some other governmental agency, irrespective of whether the person is engaged in commerce or meets any other jurisdictional tests set forth by the FTC Act.

32. The FCRA prohibits CRAs from furnishing consumer reports except for certain permissible purposes, Section 604(a), 15 U.S.C. § 1681b(a), and prohibits persons from obtaining consumer reports for any reason other than those permissible purposes, Section 604(f), 15 U.S.C. § 1681b(f). Additionally, a user must certify truthfully that it is obtaining the consumer report for a permissible purpose. Section 604(f)(2), 15 U.S.C. § 1681b(f)(2).

33. The FCRA restricts requests for consumer reports to the permissible purposes enumerated in Section 604(a), 15 U.S.C. § 1681b(a). Pursuant to the limitation in Section 604(f) of the FCRA, 15 U.S.C. § 1681b(f): "A person shall not use or obtain a consumer report for any purpose unless . . . the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section."

34. Vivint violated this restriction on the use or obtainment of consumer reports each time Vivint's sales representatives successfully sought and obtained the consumer report of a third party in order to circumvent the credit score limitations of its customer acquisition software. Circumventing credit score limitations on software is not a permissible purpose under the FCRA.

35. Each instance in which Vivint failed to comply with the FCRA's Permissible Purpose Requirement, Section 604(f) of the FCRA, 15 U.S.C. § 1681b(f), also constitutes a separate violation of the FCRA for the purpose of assessing monetary civil penalties under Section 621(a)(2)(A) of the FCRA, 15 U.S.C. § 1681s(a)(2)(A).

### Count I
### No Established Identity Theft Prevention Program

36. Paragraphs 1-35 are incorporated as if set forth herein.

37. Through the acts and practices described in paragraphs 28-30, Vivint has failed to develop and implement a written Identity Theft Prevention Program that is designed to detect, prevent, and mitigate identity theft in connection with the opening of a covered account or any existing covered account.

38. Vivint thereby has violated the Red Flags Rule establishment of an Identity Theft Prevention Program provisions, 16 C.F.R. § 681.1(d).

39. Pursuant to Section 621(a)(1) of the FCRA, 15 U.S.C. § 1681s(a)(1), Vivint's violations of the Red Flags Rule constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

40. The acts and practices described in paragraphs 28-30 constitute a pattern or practice of knowing violations, as set forth in Section 621(a)(2)(A) of the FCRA, 15 U.S.C. § 1681s(a)(2)(A).

### Count II
### Obtaining Credit Reports Without a Permissible Purpose

41. Paragraphs 1-40 are incorporated as if set forth herein.

42. Through the acts and practices described in paragraphs 13-23 and 34-35, the Defendant permitted Vivint's sales representatives to obtain consumer reports for individuals without permission in order to qualify a potential customer for a Vivint account.

43. Defendant thereby violated the permissible purpose requirement of the FCRA, 15 U.S.C. § 1681b(f).

44. Pursuant to Section 621(a)(1) of the FCRA, 15 U.S.C. § 1681s(a)(1), the Defendant's violations of the FCRA constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

45. The acts and practices described in paragraphs 13-23 and 34-35 constitute a pattern or practice of knowing violations, as set forth in Section 621(a)(2)(A) of the FCRA, 15 U.S.C. § 1681s(a)(2)(A).

### Count III
### Unfair Sale of False Debt to Debt Buyers or Collectors

46. Paragraphs 1-45 are incorporated as if set forth herein.

47. In numerous instances, Defendant transmitted to third-party debt buyers the names and addresses of individuals that were produced through the "white paging" and impermissible co-signer schemes identified above, at paragraphs 13-18, causing them to be pursued by debt buyers or collectors.

48. Defendant's actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

49. Therefore, Defendant's acts or practices as set forth in paragraphs 13-18 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

## CONSUMER INJURY

50. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act, the FCRA, and the Red Flags Rule.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, pursuant to 15 U.S.C. § § 45(a), 53(b), and 1681s, and the Court's own equitable powers, requests that the Court:

A. Enter judgment against Defendant and in favor of Plaintiff for each violation alleged in this Complaint;

B. Enter a permanent injunction to prevent future violations of the FTC Act, the FCRA, and the Red Flags Rule by the Defendant;

C. Award such relief as the Court finds necessary to address Defendant's violations of the FTC Act, the FCRA, and the Red Flags Rule, including rescission or reformation of contracts, restitution, the refund of monies paid, the disgorgement of ill-gotten gains, or other relief necessary to redress injury to consumers resulting from Defendant's violations;

D. Award Plaintiff monetary civil penalties from Defendant for each violation of the FCRA and the Red Flags Rule alleged in this Complaint; and

E. Award Plaintiff the costs of bringing this action, as well as such other additional relief as the Court may determine to be just and proper.

DATED: April 29, 2021

| | |
|---|---|
| *Of Counsel* | **FOR THE UNITED STATES OF AMERICA:** |
| GORANA NESKOVIC (D.C. Bar 997322) | BRIAN M. BOYNTON<br>Acting Assistant Attorney General<br>Civil Division |
| KEVIN MORIARTY (D.C. Bar 975904) | |
| Attorneys | MICHAEL D. GRANSTON<br>Deputy Assistant Attorney General |
| Federal Trade Commission | |
| Division of Privacy and Identity Protection<br>Federal Trade Commission<br>600 Pennsylvania Ave, NW<br>Washington, DC 20580<br>Mail Stop CC-8232 | GUSTAV W. EYLER<br>Director<br>Consumer Protection Branch |
| | LISA K. HSIAO<br>Assistant Director |
| (202) 326-2322 (Neskovic)<br>(202) 326-2949 (Moriarty)<br>(202) 326-3392 (Fax) | */s/Alisha M. Crovetto*<br>ALISHA M. CROVETTO<br>Trial Attorney<br>Consumer Protection Branch<br>Civil Division<br>U.S. Department of Justice<br>450 5th Street, N.W.<br>Washington, DC 20530<br>(202) 305-7196<br>alisha.m.crovetto@usdoj.gov |